1  37) in the Discovery Section, and rule 45, emphasize the importance of the
2  planning, preservation, and production of Electronically Stored Information (ESI)
3  as a critically important component of litigation today, and the punishment and
4  sanctions for failing to comply with the FRCP.

5      10.   It is my understanding that the city has both failed to preserve relevant
6  ESI, and has intentionally destroyed relevant ESI.  Also, Mr. Master has presented
7  many false and misrepresentative statements in his MOTION related to statements
8  that I have made.  These items will be identified in the following paragraphs.

9      11.   Mr. Master claims that the ORDER "is silent on critical issues (e.g.
10 the scope and manner of the inspection, how privileged materials are to be
11 protected, and how contents of City files are to be kept secure) that should be
12 clarified before any computer inspection proceeds."  In fact, the inspection and
13 imaging of the City's ESI is only the copying and preserving of evidence, and
14 should not be delayed any further.  Furthermore, it is not silent.  It identifies that a
15 qualified computer forensics expert is ordered to inspect and/or image specific
16 computer media that would have been utilized as a result of certain people's
17 computer related activities.  It is my opinion that the defendants (via Mr. Master)
18 are not expert at the implementation and application of computer forensic tools
19 sufficient to allow them to most effectively dictate the precise manner and method
20 of the tools' use, and that is why the court has ordered the expert to proceed with
21 the instructions as ordered.

22     12.   Mr. Master relies on a declaration from Mr. Cannon, "the City's
23 Information Technology consultant", to provide computer forensic opinions as to
24 methods and process.  In fact, Mr. Cannon is a self-employed network
25 administrator, and has demonstrated no education, experience, or expertise in the
26 very specialized field of computer forensics.  Mr. Cannon stated that he does not
27 BELIEVE (emphasis added) that "this (removing hard drives for imaging) is the
28 best course of action."  He continues on to opine about risk, and jolts.  He also

4

PADGETT v. CITY OF MONTE SERENO, et al.                                    CASE NO. C-04-03946 JW
Declaration of Scott Cooper, CMC

1  opines about imaging with USB ports as creating no risk, and that the USB
2  imaging creates the same results.  Mr. Cannon is either misinformed,
3  underinformed, or is intending to misrepresent the reality of the situation.  In fact,
4  temporarily "removing hard drives" (and not being limited to USB ports) is often
5  the absolutely best course of action, with no viable substitute, at all.

6      13.  Mr. Master frequently raises issues about how INSYNC will protect
7  the ESI that it images.  I explained to Mr. Master, repeatedly, that INSYNC will
8  protect the ESI compliant with any and all protective orders in this case, as well as
9  its 3rd decade of historically successful methods that it has used for its other federal
10 and state matters, including work for the White House, the US Department of
11 Justice, the recent Federal precedent-setting case of Medtronic v Michelson,
12 major national law firms and accounting firms, major banks, major oil companies,
13 major movie studios, and scores of other companies and entities.

14     14.  Mr. Master states that I said that I "would NOT (emphasis added) be
15 at City Hall imaging the data", and that I would send at least 2 employees.  He
16 continued on to talk about time, and that we could use a video camera.  This is a
17 complete misstatement of my words and message.  I explained that until he could
18 identify when we would be allowed to image and for how many hours each day, I
19 could not identify how many (and which) of our staff would be assigned, nor how
20 much and which equipment we would bring.  I further explained that if imaging
21 was necessary to run overnight, that we would request to have someone there to
22 monitor the process, for purposes of security or in case of a problem.  After he
23 refused to consider this approach, I mentioned that it might be possible to set up a
24 video camera, but that was NOT in any way my recommendation, nor preferred
25 method, and could in fact, cause more delays and more expense.

26     15.  Mr. Master states that he attempted (implying that he was not
27 successful) to get answers about whether the City could obtain copies of our
28 imaging work, while we were at City Hall, and prior to our departure.  The

5

PADGETT v. CITY OF MONTE SERENO, et al.                                    CASE NO. C-04-03946 JW
Declaration of Scott Cooper, CMC

1 Padgetts explained that having us give the City a copy of our images was neither in
2 the order, nor within the scope or spirit of the order. None-the-less, I did provide
3 two such mechanisms for that to occur, should the court so order it, or if the
4 Padgetts agreed to it without a court order.

5     16. Mr. Master states that he attempted (implying that he was not
6 successful) to get answers about the software that we might use. In fact, I listed
7 several pieces of software that we might use, and identified the likely primary
8 piece of software that we might use, but that we could not define with certainty the
9 limiting software that we would use because the selection and use of software is a
10 dynamic decision, based on the issues and equipment that are being presented at
11 the moment of imaging.

12     17. Mr. Master states that he attempted (implying that he was not
13 successful) to get answers about how the imaging process would occur. He also
14 states that I "would not agree to do it via USB". In fact, it was he that insisted that
15 we ONLY do it via USB, and it was I who said that USB is a possible method, but
16 is not necessarily our first or best choice or recommendation. This issue of USB is
17 an important one. Mr. Master seems intent on dictating that the USB method is the
18 only one that be allowed. In fact, the decision of which method to be used should
19 be able to be determined contemporaneously with the imaging activities, to best
20 allow for efficient, reliable, complete, and problem-free imaging to occur.
21 Furthermore, limiting the imaging process to the USB method will often allow
22 evidence to be missed, irrespective of, but especially in situations where evidence
23 spoliation and potentially missing evidence is an issue.

24     18. Mr. Master states that he attempted (implying that he was not
25 successful) to get answers about how we could target specific portions of the City's
26 equipment. In fact, I explained that in his hypothetical of "is it possible to target",
27 I explained that the answer is "Hypothetically, yes, but how his question (and
28 restatement) is phrased is impractical and ineffective." The bottom line is that

6

PADGETT v. CITY OF MONTE SERENO, et al.    CASE NO. C-04-03946 JW
Declaration of Scott Cooper, CMC